you going to both talk? No, Your Honor. Good morning. May it please the court. My name is Jordana Thigpen. I'm joined by my colleague, Angela Alioto. We represent Holly Perez in this case. All right. Are you going to use all the time yourself? Yes, Your Honor. Okay. So just so that you know, I've occasionally had people try to pop up from council table, and, um, I don't allow any discussions from the peanut gallery. If you're the one talking, then you, it's, that's why I want to know. Did you want to, um, we can take the clock back. Um, did you want to reserve any time for rebuttal? Yes, Your Honor. Four minutes. All right. That's all aspirational. If you have the time left, then, um, okay, let's proceed then. Thank you. Thank you, Your Honor. May it please the court. My name is Jordana Thigpen. I want to thank Your Honors and the court staff for the opportunity to argue in person. It's very nice for us. Well, you can thank us after if you still feel the same. Thank you, Your Honors. This case is a case in which we have an entire bucket of disputed facts. We have a voluminous record, as Your Honors are aware, from the pleadings that have been submitted, as well as the evidence that was submitted both in the moving papers, in opposition, and, um, you know, even with defendant's reply in the underlying record. I kind of, I'd like to tell you what, what I'm struggling with here so that perhaps you can give me your best answer and the other side can be thinking about it. Uh, Ms. Perez appears to concede that she manipulated time cards and that it violated UPS policy regarding honesty and integrity. So why is that not, and this is what the court seemed to do below, why isn't that dispositive of the question of whether she's performing satisfactorily? Okay. First of all, Your Honor, the term manipulated I don't think is accurate. Ms. Perez does concede that she edited corrected time cards. That is UPS policy. It is permissible for time cards to be edited and corrected. In fact, I believe that's you'd be hard to find. But the corrections being made were to allocate time factually and accurately to a different pay period, and that's not consistent with the policy. Maybe it's, you know, maybe you disagree with the characterization that that's manipulating, but it is not accurately recording the time for the time period. Is that correct? Your Honor, it's disputed exactly what happened with these time cards. That's the issue. We were never given the opportunity to present the exact purpose of all of these edits that were made. And by the way, there really isn't that many edits that we're talking about. The allegation from the underlying individual, Ms. Peak, was that there were hundreds of time. I thought that she said that she corrected time cards when she shouldn't have. That's pretty simple concession. Am I wrong that that's what she conceded? Accurate that that statement, in fact, is in her deposition testimony. Well, then she didn't perform satisfactorily if she is in violation of company policy, altering time cards. Why is why is that incorrect? It's incorrect, Your Honor, for two reasons. First of all, most attorneys have not been deposed. I personally have not taken hundreds of depositions. Everyone performs differently at their depositions, depending on their sophistication, their experience, et cetera. I think there's an issue of fact here as to whether she was simply repeating what she had been accused of versus actually conceding and admitting, yes, you're right, I have no case, I'm completely a fraud, I've done this fraudulent activity. But, counsel, that's an odd way of characterizing disputed facts. It's one thing if she comes in and says, I didn't do X on that day, that somebody says that I did. That's a dispute of fact. But to draw an inference from an answer that she gave in a deposition, that's a second-order fact. That's not like you say, well, we don't draw that inference. We disagree with the inference that can be drawn from the answer that she gave in the deposition. But drawing inferences in favor of the non-moving party is exactly what should happen at summary judgment, Your Honor. And this is the issue, is that all the inferences that the district court made, you see, were done in favor of the moving party, in favor of UPS. That's not the standard for summary judgment, particularly with regards to evidence. And I will address that issue with the evidence momentarily. But I want to be clear here. A single throwaway comment, you know, there's no video deposition. By all means, at trial, they can explore this and ask her, why did you say that? She could have been being sarcastic. We just don't know, because that's the one statement among all her other testimony, you see, where she said, I was editing time cards based on the instruction I got from my manager, Chin. He told me how to do it. All the mails were edited. She also said she instructed her part-time supervisors to change time cards any time a meal violation report would come up. So that suggests that she admitted to falsifying the cards in order to avoid the detection of a meal violation. She absolutely did not say that. I just read words that are quoted from what she said. How does that not spell what I just said? I mean, that inference seems unavoidable. Your Honor, I believe the quote that you're referring to is taken from one of the investigator's reports. It is not supported by her testimony. It is... Judge Collins is reading from her testimony. Are you reading from her testimony, Judge Collins? I'm going to pull up the actual page of the excerpt. There was... Okay, just hold it one sec. You can stop the clock while Judge Collins is pulling up the excerpt. Thank you. Yeah, the comment is on page 740 of the excerpt. Let me find the actual line. Yeah, the question is, now during that meeting, you did acknowledge that you instructed your part-time supervisors to change time cards to avoid meal violations, right? Answer, not every day. It was any time a meal violation report would come up. So that's not the investigator's report. That's her own deposition. Your Honor, again, there are legitimate reasons why these reports are done and why corrections are done. Corrections are done on a regular basis. The part-time supervisors are employed for that purpose, to make time card edits. That's the issue of fact that we're talking about. We can explore these specific... Again, we can explore these specific edits and specific issues that have come up. All right, but that is her testimony. All right, so you're stuck with that. So what else is there in the record that would create a triable issue on how to interpret that? What else is there in the record? So, first of all, there is no time card edit policy whatsoever at UPS. And in McGinnis v. GTE Service Court, this court stated that it was a fact that supported the inferences to be drawn in favor of the moving party, that there was no policy in effect. So how could she know what she was violating? That's one issue. Secondly, she was instructed by her manager, Chin, as I stated a moment ago, to make these edits. Is that in the record? Oh, yes, yes. There's much testimony on that issue. There is, you know, Perez herself provided testimony of the edits she was making, and she provided the testimony that Chin had given her the instruction. She also made that declaration. There is evidence from Chin himself that he... Okay, settle down. I apologize. Okay, slow down. Let me ask you a question here. I mean, how did the investigation of her time card violations, how did that come about? So that is another issue of fact that we believe supports. What does the record say about that? How did that come about? Why did she come under investigation? Because when I look at the record, there's a period of time I realized this woman, Ms. Perez, is a longtime employee that seemed to do very well, and then she got this job, and this job didn't go well, and there's a lot. I'm not going to say what the reasons are for that. But anyway, up until that point, she had a pretty unblemished record at UPS of 20 years or something like that. So then we have a lot of evidence in here that there were... She was having problems with people from the union. People from the union were filing grievances on her. There were meetings that were happening, and somehow in this period of time, the time card investigation happened about her, and those people, I believe, were her subordinates. So how did that come about? What precipitated her getting investigated for time card violations? Because the time card violations relate to the CBA, as I understand it. The CBA relates to the union, so I'm trying to figure out how that works. Yes, so the timing and the sequence of events is accurate, as Your Honor has described it. In May of 2019, she complained to the union boss, if you will, Mr. Sweeney. Then Mr. Sweeney, and she told Mr. Sweeney at that time in May, I'm going to be, you know, and she told Ms. Seymour as well, another UPS employee who worked with the union, and she stated, I'm going to be filing formal charges with HR. At that point, just a few days later, on June 4th, 2019, an anonymous hotline complaint comes in through the UPS corporate, you know, this hotline they maintain, complaining about time card fraud from Ms. Perez. UPS doesn't really do anything about it at first. Then on June 17th, 2019, she speaks to Mr. Crouch, who was a labor relations individual at UPS, again working with the union, and she complains about harassment from one of the drivers that's at issue. Then that was on 6-17. She testifies that on 6-18 and 6-19, around 6-18, 6-19, Mr. Padilla, this driver, screamed at her in front of other employees. Then on 6-19, at that point, she contacts Sweeney and says, I'm going to file formal charges with HR. Then on 6-20, the next day, that's when UPS sends the investigator out to perform interviews, and who do they interview? They interview the harassers themselves. Can you tell me where in the record you made an assertion about her raising a warning in May that she would file a formal HR complaint? Where in the record is the support for that assertion? That's in her declaration, Your Honor, and it is at paragraph 38. The site is 4-ER-631, and that's in her declaration. As well, I believe it is also in the formal complaint that she filed contemporaneously on July 9, 2019. That site, I believe, is at 14-41, I believe. That's her full HR complaint that she filed. You see, that is a very important document for us. That complaint that she filed on July 9, that has a summary of what was going on in the workplace at that time. That was disregarded by the district court. The district court actually disregarded a lot of our evidence that we submitted in opposition respectfully. It did, and that's the issue that we're talking about. Well, the district court struck some declarations, I believe. Yes.  Generally, it's a harder standard to overcome. But it seems to me that those declarations would be evidence that would go to the hostile work environment. Is that correct? Yes, among other things. It would go to the harassment. It would go to the complaints that she made. It would go to the overall discrimination. It would go to the retaliation. It would go to all the claims. In fact, the district court did not correctly apply the rule from Van Asdale, which is the law of this circuit. Well, let's just say if hypothetically, and I'm not saying this is what we're going to find, but I'm just saying hypothetically, if we found her deposition testimony and admission regarding the UPS policy on time cards, if we found that to be a problem, that goes to her discrimination claims. It doesn't go to her hostile work environment. The hostile work environment is a separate analysis. Am I wrong on that or right? No, that's accurate, Your Honor. Okay. So I guess there's also – I think that's your hardest element. There's also – I think there was a claim about whether there was sufficient evidence on gender discrimination, and I believe that UPS filed evidence that Lagos had filed 1,500 grievances a month against both female and male managers. And those were submitted on reply? Those were part of the Carter Declaration exhibits? I believe that those grievances are Exhibit D, I believe, of the Carter Declaration. Exhibit B, I think, is the time card audit reports. We objected to that declaration. We were never given the opportunity to substantively address that. Oral argument is obviously not sufficient evidence. So the declarations on the hostile work environment were kept out because the judge said they were inconsistent with her deposition testimony? Yes, and I've provided numerous citations to her deposition testimony that establish that, in fact, it is not inconsistent. The rule announced in Van Asdale is very clear. There has to be a two-part finding, specific factual findings. That decision is very clear on that issue and very detailed. And that was not followed in this case. We also have Messick. We have Kennedy. We have a whole line of cases that supported Van Asdale. Looking at Yeager, which was the case cited by the district court, that plaintiff deserved to be held as a sham affidavit. He testified he couldn't even remember if he was in a plane crash. It made no sense. What is your best argument of a hostile work environment on the evidence that was considered admissible? Tell me what it is. But then if I didn't agree with the evidentiary ruling, what would be added by the declarations? I think the best evidence is that this is an individual that was subjected to increasingly physical harassment. A gentleman coming in, Mr. Gallegos and others, pointing fingers in her face, looming over her desk, using their physicality in an abusive and harassing manner. She asked for help. She complained. Nothing was done. Nothing was done to remedy this increasing physicality. Was she to wait for actual assault, for actual battery? It's not acceptable conduct in the workplace, and all of UPS's witnesses agreed on that point. And yet the court found that, well, it essentially agreed with UPS's argument, well, she's not being physically battered, she's not being touched on the arm or touched somewhere else, so it's okay. That's not the law of this circuit, and it's not acceptable conduct in today's workplaces. This is not a civility code. This is about what people are entitled to expect when they go to work. They shouldn't have to be having fingers pointed in their faces repeatedly and people looming over their desk as if to assault them. It's not acceptable. That, I would say, and the increasing and the escalating nature of that is the best evidence of that. All right. Let me see if my colleagues have any additional questions. They don't appear to. So we've gone over time. I'll give you three minutes for rebuttal. Thank you so much. Because this has got a lot of facts in it. So we'll hear from UPS at this point. Good morning. Good morning. Try to get close. Is that good? Yes. I think so, yes. Thank you, Your Honors. May it please the Court. If I may, I'd like to start with the question that you asked with respect to the meal violations. I want to clarify a couple of things. First of all, Mr. Sweeney, she mentioned a meeting in May. UPS was not aware of that meeting that happened in May. That somebody that works for the union does not work for UPS. If she had that conversation, UPS wasn't aware about it. What we do know is that in early June. I think the conversation was with Seymour. What is Seymour's status? I believe he's with the union. I think it's a she, isn't it? Seymour is a woman. Seymour is a woman. She's a labor manager. That is with UPS. But then you're wrong in what you just said. I mean, because if the conversation in May was with Laurie Seymour, who's with UPS. And it was with UPS, not with you. Well, I'll allow opposing counsel to clarify, but I believe the conversation as alleged. And the declaration is with a Mr. Sweeney with the union. Paragraph 38. That's what council referred to. I just looked at. Yeah, I can tell you what paragraph 38 says. I have it right here. It says shortly after the meeting, I told Miss Seymour in what I believed and explained to her in confidence that if this did not stop, I was going to file official harassment charges. Yes. Miss Seymour is a, is a labor manager. For UPS. For UPS. So you're on notice on that one. There's the point I'm making is that then there's this anonymous. June six report to the hotline complaint. No one has ever suggested that Laurie Seymour made that hotline complaint. But let's. They just said it was, I just asked for here's, here's my, my global problem with this. It's the, the. It seems that what the district court did was started with taking Perez's admission that she manipulated time cards and that that was a violation of US UPS policy and said, therefore you can't show that you were performing your job satisfactorily. It also seems that the district court looked at the deposition testimony and said that her statements of what the harassment that happened was inconsistent with some declarations that they attempted to offer and struck them as sham affidavits. So my, but what I'm seeing here and what I have to, there's a lot of facts here and what I'm seeing here is a 20 year employee that gets promoted as it were, and then she may be terrible for this job that I can't, I can't say that one where sometimes people are great at other jobs and then they're terrible at another job and all, you know, everything goes downhill. They, what is the Peter principle? You get promoted once above where you belong or something like that. But then you have this month, several month period of time where they're, you know, they're screaming, yelling, pointing. There are grievances filed against each other. There are meetings about harassment. Then you have this anonymous tip about the time cards. And then supposedly, I guess, after she's told that she's being investigated, then she goes and kind of thugs up on the people that are working for her and says, why are you complaining about me and all of that? But it's really, it's, it, it isn't as, it's not so easy to just say that it, it isn't all related. And I'm having to resolve a lot of factual issues in order to come to the conclusion that there's no there, they're here. And that always makes me comfortable, uncomfortable on a summary judgment. Well, I think we can simplify the case because there's been a lot thrown in factually, but I think if you just look at, and you've, you've summarized the case perfectly. She has a career at UPS. She gets promoted to manager July, 2018. And shortly after that, a new business agent from the union who's employed by the union, Mr. Gallegos, he, he comes in in December. That's when everything started to go, go badly. I think what you have is a, is a manager who's not used to working with the union. She's not used to having the union talk back to her, but in fact that's what they're there to do. Mr. Gallegos is there to make sure that she's following the CBA and she doesn't have to be either with respect to the meal breaks and things of that nature. If you look at the first grievances, is there anything in the record that her supervisor told her how to change the time cards? I'll address that. So Mr. Chen, of course, there's two different things. There's editing a time card, which all managers and supervisors do. And then there's manipulating a time card to, to make it unlawful to, to say that someone didn't work hours that they did. If you edit a time card, let's say an employee forgets to clock in and it's 9 a.m., they forget to clock in, they come to their supervisor at 10 and they say, I got here at 9, but I forgot to clock in. You can make that edit, fix that, right? That's different from what the plaintiff did in this case. So when she says, Mr. Chen told me to, I could edit time cards, all supervisors do that. But what you don't do is violate the law. And she's, she's. It's not the easiest situation. And, you know, sometimes it's really easy if someone steals things for their own benefit or something like that and you look at that kind of fraudulent behavior, it's really easy to look at that and say, okay, I, I, you weren't doing your, you know, there's no, there's no excuse. But what they're trying to say is there's all of these things going on at the same time and pressure's coming from all sorts of different directions, and including she's having people, it doesn't, it seems undisputed that people are sort of yelling at her or pounding at her, you know, pointing at her. And Mr. Gallegos doesn't sound like he'd be, I'm glad he doesn't work, I'm glad I don't have to work with him. But that being said, that, so, you know, it's, it's, I guess the hostile work environment is giving me some indigestion here, that I can resolve that here on summary judgment. And I'm happy to address that. But with respect to the meal breaks, I think if you just look at the fact that Brittany Peek, the supervisor that worked for the plaintiff, told the investigators and testified under oath that every day this meal break violation thing, if someone worked nine hours without a break, that's not, that's a violation of California law. It's also a violation of the CBA. After that time card would get submitted, that would go to Mr. Chin, plaintiff's manager, and he would see that there were violations and he would talk to the managers, he would send emails out. What plaintiff's motivation was, was to avoid that. And there are emails in the record where he says all these managers have meal break violations, but the plaintiff did not. And so what she was telling Brittany to do is if you work nine hours, put him down for an hour break, unpaid break. So take an hour of work time away from him. And Brittany said that was happening every day. Sometimes also, UPS has a policy in the CBA, you have to take a full one hour break. So if someone took a half an hour break, she didn't want to get in trouble and submit that time card, so she would change it to be an hour. Did anyone ever counsel a 20-year employee about doing these times, you know, doing all of this and meal breaks and all of that? You mean teach her how to do it? Yeah. Well, here's another thing. Do you think that the anonymous tip, it went, you know, it went to guns right away and said, okay, you have integrity and all of those violations as opposed to the fact you're a bad manager? Yeah, and she had been doing it for quite some time. And if you look at the note, because Brittany Peek didn't just submit her statement, she submitted a handwritten note that she said was written by the plaintiff. And one of the notes she said is she said don't give one of the defendants overtime. Mr. Padilla said don't give him overtime. So that suggests that he worked overtime and she wanted to be vindictive and take that overtime away from him when she was doing the time cards. But to address your hostile work environment issue, if you look at just the complaint. It sounds like a terrible place to work during that period of time. Well, I'll tell you, as an attorney for UPS, dealing with somebody as a manager, when you're dealing with union officials and stewards, and I cited some case law, it can get intense. But we have to allow them to do that or we'll be in violation of the National Labor Relations Act. So there's going to be some arguments over things. And quite frankly, though, a lot of these grievances were clear violations of the CBA. Counsel, on the changing the time cards, what you portrayed is that there was some motive for her to avoid scrutiny from other managers. Now, did this also work to the detriment of her employees whose time she was changing? Oh, yes. So, for example, as Brittany Peek testified, if you worked nine hours, you should be paid for nine hours, and you don't need to be trained to know that that is. And she would take an hour off of it. Was it added someplace else? Did that change the time and a half or anything like that? No. So she was just altering time. That's right. Without compensating for it someplace else. That is correct. For an extended period of time. And there were other manipulations, but I think that's the clearest one, that it's obvious. You don't take an hour away from somebody. I mean, that's five hours a week. That's 20 hours a month you're taking from someone's time. So if that says she wasn't performing her job, that takes care of the discrimination. But it doesn't take care of the hostile work environment. So help me on that. Yes. So if you just look at the complaint, it talks about Gallegos. It talks about the plaintiffs. And just the allegations in the complaint are the pounding of the fist. There's no sexual comments. There's no grabbing. There's no physicality whatsoever. It's arguments. And all of it, as she admits during her deposition, particularly with the two union stewards, she admits it was always related to the workplace and arguments they had about her not complying with the CBA. And she even admits during her deposition that she doesn't think those two defendants, the union stewards, were doing it based on gender. Well, but Perez testified specifically that she thought Gallegos, and based on her observations that Gallegos treated her differently than male supervisors, that with them, she said that he was more professional, would shake their hands, joke around, and that she was singled out by Gallegos for this kind of abuse. And what I think is— That supports an inference of a hostile work environment that's gender discrimination. Well, if you just look at her allegations, if you go to her deposition, and said, hey, tell us the instances, all the instances of harassment. And she had three instances with Gallegos where he pounded his fist and yelled at her. I think there were two or three instances with Mr. Padilla, and it was similar things. He raised his voice. And then with respect to the final defendant, she just said he asked her every day for the nine-to-five list and other materials that he's entitled to. Gallegos is not an employee of UPS. No. So let's suppose that it was very clear that he was treating her differently from everybody else and that he was singling her out and harassing her in ways that if it had been an employee, particularly if it had been a boss, it would have been very clear that she would have had a claim. What then does she have to show? Does she have to show that UPS is on notice, or can she claim a hostile work environment based on the actions of a non-employee that she's required to work with? Yeah, we argued that because he is in the building and we're on notice, that that is sufficient, particularly under the failure to prevent harassment. So UPS has to be on notice? Yes. Okay. And if they're not on notice, is the law clear that that is not a hostile work environment case? That is clear. But my point is, and to simplify, is if you look at what she said during her deposition, the three instances, the two instances, being asked for paperwork, that's not – it has to be egregious. It has to be severe or pervasive. Okay, but that also assumes that the district court was correct in striking the other declarations and calling them sham affidavits. And I wonder if, let's say someone left something out, if sham affidavits, and I've stricken things for that too, but this struck me as they weren't so clearly sham affidavits to me as some that I've seen. I mean, a person could say, well, yeah, I didn't think of everything that had happened, and then they're not saying that that didn't happen. So she's getting nailed again for her deposition. Right, and I think if you look at her deposition testimony, there was a lot of questions because we want to know what all the allegations are. And so it was asked, is there anything else, any other person that harassed you? No, it's just these three. And so what does she do in her affidavit? Do you have proof that those others are made up, the ones that were stricken as sham affidavits, or is it just simply she forgot to mention those? I think her testimony is that she forgot to mention these other people. But one of them she was even asked about because his name came up during her deposition, Mr. Torres. And we asked her, but Mr. Torres is not part of your allegations in this case, right? Right, she agreed with that. And now she's trying to add him as a harasser. And it's vague in her declaration in her affidavit as to when it even occurred. She just makes some allegation about this Mr. Torres that happened at some point, and we know that it happened before she became a manager. So it wasn't even in 2018. It could be time-barred. We don't know. We weren't able to ask about it because when we asked her during her deposition, is this guy part of your claim, she said no. Let me ask you, is there any evidence in the record of UPS firing another manager for making changes to employee time cards? There's a declaration from one of the investigators, the one that recommended she be terminated, that he had recommended another employee, a male manager, be terminated under similar circumstances. And was that person terminated? We don't know. He couldn't remember. Okay. Do you agree that Perez had a spotless record prior to the time card issue? And if so, does that fact have any relevance in assessing the sufficiency of the claims? I believe leading up to her time as a manager, she had a good record, and I'm not going to dispute that. But there were a number of grievances that were filed against her that were legitimate. For example, the one that I didn't get to is she had someone told her to take off his union pin. I mean, that kind of shows that she doesn't like unions. So I would say that those kind of things, the grievances that were legitimate, calling people on their day off, tell them to come in, which is a violation of the CBA. And quite frankly, a manager shouldn't be doing that. Someone could be off of work for FMLA. At some point in the proceedings, though, I think they reached some sort of agreement that the grievances, they were dropped, some of them were dropped, she claims in there. I don't – does the record support that too? The results of the – and there are a lot of grievances, but the results of the grievances, for example, the way it works is someone wants – they say, hey, she's calling me to come in on my day off. They have a meeting to try to resolve informally the grievance. Plaintiff says, sorry, I won't do that anymore. Okay, it's over. And that's the way 90% of those get resolved. Okay. We're over time, but let me see if either of my colleagues have any additional questions. No. Thank you very much. All right, thank you. All right, I gave you three minutes for rebuttal. Thank you so much, Your Honor. I apologize. Thank you. I just want to address a couple points. First of all, with regards to the grievances, those are part of the documents that were submitted with reply that we submit were improperly considered. And, you know, here again, they're being put forth for the truth of the matter that's in there. We were never given an opportunity. Each one has to be analyzed. I almost feel like we're post-trial. We're having this discussion on an appeal after a trial because there are so many issues of fact and inferences to be made, and that's the issue here. They were all doing time cards, and there is a lot of citations that are set forth in our opening brief and in our reply with regards to the lack of training that she received on one hand and then also the training that she did get from Chin to make edits to time cards. She asked for training as a new manager and was not provided with it. So she was really kind of operating in the dark, and that's a significant issue because how could she be frauding and doing bad behavior if she didn't even know what she was doing? And it's undisputed that she asked for training and was not provided it. That's very significant. Also, the union isn't there to assault her. It's not an appropriate argument to say, well, you know, union people, they're just a bunch of goonies, as one of UPS witnesses referred to them, and that's in the record. It's not sufficient to say, well, it's just a rough and tumble world. These are exactly the kind of arguments that were made about, for example, the oil drilling, the oil rig work environments when women have been making claims about sexual harassment and sexually charged atmospheres that are going on. Well, I think they were, but weren't those were other employees of the same company. Here, I think what Judge Bybee was saying, that the union people don't work for UPS. Sure, but Judge Bybee pointed out that, you know, is there a question of notice? Do they have notice? Well, we don't even have to get into whether or not, you know, that's the law because they did have notice. She did complain. She made repeated complaints. She complained about harassment on 313, and she did mention the employee in that. What was the time period from her promotion to her termination? So her promotion was, I believe, in November of 2018, and then her, and she only was managed by Chin for a short time during that window of time. And then he, I believe he went on to a different position at that point. Then she was managed by a different individual there, Valero, okay? And by the way, I want to, and she was terminated in July, sorry, August of 2019, just to answer that question. Okay. I also just want to say one thing, too, about the benefit. There's no benefit here to her to do any of this. Well, except they review those things. And if you are out of compliance, because, you know, wage and hour violations cost employers a lot of money. And, I mean, and the penalties and all of that stuff just pile up, and they're millions and millions of dollars. So they apparently review these, and you get props as a manager if you're complying with the proper law. And if the case, if she's showing that people are working nine hours without any meal breaks, that's going to, as a manager, she's on the hook for that. So let me address, I see I'm out of time, but I want to address that. Yes, quickly. I want to address that question precisely, is the email that he's referring to, that he referred to, and that Your Honor is referring to, that she got the occulots, that email took place before Peek and Dowling were doing these edits, allegedly doing these edits on her behalf. So if she had this fraudulent scheme, how was it accomplished, you see, before she, because she is undisputed that she didn't have the training, she didn't know what she was doing. So how could she have carried out this fraud and done these edits if Peek wasn't working there yet? That's an inference, that's something that has to be tested at trial, and that's why it's so important to have this case trial. There was no benefit to her to do any of this. All right. Well, unless my colleagues have additional questions, that will conclude the time for argument. Thank you. They don't appear to. Thank you both for your argument today. This matter will stand submitted, and this Court will be in recess until tomorrow. Thank you.
judges: BYBEE, CALLAHAN, COLLINS